UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | § |
| | § |
| VS. | § CRIMINAL ACTION NO. 5:18-CR-361 |
| | § |
| KEVIN SCOTT CORDES | § |

## ORDER

Defendant was indicted for two counts of transporting undocumented aliens in violation of 8 U.S.C. § 1324 and one count of conspiring to do the same. (Dkt. No. 21). Now before the Court is Defendant's Motion to Suppress (Dkt. No. 28), which argues that government agents searched his vehicle without first obtaining probable cause or consent. In its Response, the Government acknowledges there was no probable cause, but asserts that Defendant consented to the search of his vehicle.

The Court conducted an evidentiary hearing on June 21, 2018. After considering the briefing, the evidence received, and the applicable law, the Court finds that the Government has not proven that Defendant consented to the search of his vehicle. Defendant's Motion to Suppress (Dkt. No. 28) is therefore **GRANTED**.

### I. BACKGROUND

Resolution of this matter turns on what the Government can show transpired within a seconds-long timeframe. While the course of events within that critical window is contested, the following is not:

Laredo provides individuals and businesses access to Interstate Highway 35,

"the only Interstate Highway connecting Mexico and Canada through the U.S. heartland."[1] There are four international ports of entry from Mexico into Laredo.[2] International shipments traveling through Laredo are primarily inspected at these ports—searches and seizures may be conducted at such locations even absent probable cause or a warrant.[3]

This case, however, stems not from a search conducted at an international port of entry, but at a permanent checkpoint within this nation's borders. Border Patrol agents are permitted to establish permanent immigration checkpoints to briefly detain motorists and make immigration inquires.[4] One of the nation's busiest Border Patrol checkpoints is located just north of Laredo near the 29-mile marker on Interstate Highway 35.[5] All traffic—whether passenger car or tractor-trailer, commercial or non-commercial—traveling north by IH-35 is inspected at the checkpoint.[6] Agents stationed at the checkpoint are tasked with the important duty of conducting immigration inspections of passers-through. While some malefactors

---

[1] TEX. DEP'T OF TRANSP., I-35 STATEWIDE CORRIDOR PLAN: A PATH TO 2040 1 (2016).

[2] *Laredo, Texas-2304*, U.S. CUSTOMS AND BORDER PROT., https://www.cbp.gov/contact/ports/laredo-texas-2304 (last visited July 10, 2018).

[3] *United States v. Cervantez-Valerio*, 275 F. App'x 417, 420 (5th Cir. 2008) (citing *Flores-Montano*, 541 U.S. at 153); *see also United States v. Flores-Montano*, 541 U.S. 149, 152–53 (2004) ("[S]earches made at the border, pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border." (quoting *United States v. Ramsey*, 431 U.S. 606, 616 (1977)).

[4] *United States v. Martinez-Fuerte*, 428 U.S. 543, 564 (1976).

[5] *Laredo North Station*, U.S. CUSTOMS AND BORDER PROT., https://www.cbp.gov/border-security/along-us-borders/border-patrol-sectors/laredo-sector-texas/laredo-north-station (last visited July 10, 2018).

[6] *Id.*

2

are incidentally apprehended in the course of these inspections, the vast majority of travelers are law-abiding citizens who are ultimately allowed to pass.

On May 1, 2018, Defendant drove a white box truck into the IH-35 checkpoint. (Dkt. No. 39 at 8–9). He was greeted at a primary-inspection lane by Border Patrol Agent Chase Kelley. (*Id.* at 9). After a brief interaction—the focal point of the instant dispute—Defendant followed Agent Kelley's directions and drove his vehicle to another lane where it was scanned by the checkpoint's Vehicle and Cargo Inspection System ("VACIS"). (*Id.*). The VACIS uses gamma-ray imaging to search for anomalies within the cargo area of commercial vehicles. (*Id.* at 10). It revealed multiple anomalies within Defendant's truck. (Dkt. Nos. 28 at 5; 31 at 1–2).

Defendant was subsequently apprehended, and a number of undocumented aliens were discovered within a non-factory compartment of his vehicle. (Dkt. Nos. 28 at 5; 31 at 2). Following his arrest, Defendant made a series of incriminating statements. (Dkt. Nos. 28 at 5). He has since filed the instant Motion, arguing that the search of his vehicle absent probable cause and consent was unconstitutional and requesting that all evidence derived therefrom be suppressed. (Dkt. No. 28).

In response to Defendant's Motion, the Government "does not contest that a VACIS scan constitutes a search. Nor does it challenge the contention that such a search, absent consent or probable cause, is improper." (Dkt. No. 31 at 2). It has not asserted any theory that the connection between the alleged constitutional harm and the evidence to be suppressed was attenuated by intervening

3

circumstances, or that the violation otherwise may have been cured. The only argument advanced by the Government is that Defendant consented to the search of his vehicle and that the fruits of that search should not be suppressed. (*Id.* at 2–3).

## II. LEGAL STANDARD

The Fourth Amendment protects the right of the people against unreasonable searches and seizures, and the court-fashioned exclusionary rule requires "suppressing evidence obtained in violation of this command." *Davis v. United States*, 564 U.S. 229, 236 (2011). Government agents who stop a vehicle at a fixed checkpoint and enter the vehicle to uncover things not readily visible from its exterior potentially implicate the Fourth Amendment in two ways: (1) seizing the occupants of a vehicle by stopping it, and (2) searching the vehicle's interior. *See, e.g., New York v. Class*, 475 U.S. 106, 114–115 (1986) ("While the interior of an automobile is not subject to the same expectations of privacy that exist with respect to one's home, a car's interior as a whole is nonetheless subject to Fourth Amendment protection from unreasonable intrusions by the police."); *United States v. Martinez–Fuerte*, 428 U.S. 543, 556 (1976) ("It is agreed that checkpoint stops are 'seizures' within the meaning of the Fourth Amendment.").

A routine stop for brief questioning at a fixed Border Patrol checkpoint is reasonable under the Fourth Amendment. *Martinez–Fuerte*, 428 U.S. at 566–67. Unlike at this country's ports-of-entry, however, searching a vehicle at an interior checkpoint is reasonable under the Fourth Amendment "only if justified by consent or probable cause to search." *Id.* at 567.

"When courts review a search justified by consent, there are four distinct issues." *United States v. Dilley*, 480 F.3d 747, 748 (5th Cir. 2007). First, the Government must show, based on the totality of the circumstances, that the defendant did consent to a search. *Id.* at 748–49 (citing *United States v. Price*, 54 F.3d 342, 345 (7th Cir. 1995)). Second, once the Government has demonstrated consent, it needs to demonstrate, again based on the totality of the circumstances, that the consent was voluntarily[7] granted. *Id.* at 749 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973)). If the Government demonstrates that consent was given voluntarily, two final questions must be addressed: (1) whether the search was within the scope of the consent granted, and (2) whether the consenting individual had authority to consent. *Id.* (first citing *United States v. Ibarra*, 965 F.2d 1354, 1356 n.2 (5th Cir. 1992) (en banc) (per curiam); then citing *United States v. Matlock*, 415 U.S. 164 (1974)). "Unlike the first two issues, scope and authority are not determined based on a totality-of-the circumstances standard, but rather by a reasonable-officer standard." *Id.* (citing *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)).

III. ANALYSIS

The Government asserts that Defendant voluntarily consented to the search

---

[7] In considering whether consent was voluntary, courts in the Fifth Circuit consider six factors, "all of which are relevant, but no one of which is dispositive or controlling. *United States v. Solis*, 299 F.3d 420, 436 (5th Cir. 2002) (citation omitted). The factors are: "(1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedure; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found." *Id.* at 436 n.21 (quoting *United States v. Kelley*, 981 F.2d 1464, 1470 (5th Cir. 1993)).

of his vehicle, and it has the burden of proving as much by a preponderance of the evidence. *United States v. Walker*, 706 F App'x 152, 157 (5th Cir. 2017) (citing *United States v. Tompkins*, 130 F.3d 117, 121 (5th Cir. 1997)). To that end, the Government presented the following evidence at the suppression hearing: (1) video of Defendant's interaction with Border Patrol Agent Chase Kelley at primary inspection; (2) the testimony of Agent Kelley; and (3) the testimony of Homeland Security Investigations (HSI) Special Agent Ryan DiAndrea.

### A. Video of Agent Kelley's Encounter with Defendant

The video of Defendant's brief stop at primary inspection was played for the Court. Nineteen seconds long and lacking audio, it reflects the entirety of Agent Kelley's recorded interactions with Defendant. (Dkt. No. 39 at 13).

The video opens with a shot of Agent Kelley manning an empty lane at the IH-35 checkpoint. Several seconds later, a white box truck enters the scene and drives into Agent Kelley's lane. The vehicle comes to a stop at the nine-second mark, as Agent Kelley steps forward to speak to the driver. Before the eleven-second mark, Agent Kelley's hand rises to begin gesturing Defendant toward something off-screen. At the twelve- and thirteen-second marks, the vehicle begins pulling forward as Agent Kelley gestures in the same direction with his hand. At the fourteen-second mark, the vehicle comes to another stop; Agent Kelley steps toward Defendant's door and for a third time points him in the direction of something out of the camera's view. The vehicle pulls forward and out of frame.

## B. Testimony of Border Patrol Agent Kelley

On the witness stand, Agent Kelley testified that when Defendant arrived at his location, he conducted an immigration inspection (i.e., he inquired as to whether Defendant was a United States citizen). (Dkt. No. 39 at 9). After receiving a verbal "yes," the agent said that he asked Defendant for consent to be scanned by the VACIS system. (*Id.*). The agent could not recall what he said to Defendant during this leg of their exchange but proffered that "the general tenor of the discussion" "was a consensual question for permission to be scanned by the VACIS." (*Id.* at 10–11).

The Court pointed out to Agent Kelley that his interaction with Defendant took place quite rapidly, and asked how he had been able to inquire as to Defendant's citizenship, receive an answer, and then ask for permission to search Defendant's truck with the VACIS all between the nine- and eleven-second marks of the video. (*Id.* at 16–17). Agent Kelley responded that he did not remember what he said to Defendant; normally, though, he issues inquiries along the lines of "can we scan your truck" or "can we x-ray your truck." Agent Kelley also could not recall whether Defendant gave verbal consent to search, only that Defendant had "no issues, no problems, he didn't protest it, he had no problem with going to the VACIS." (*Id.* at 18). Upon further questioning, Agent Kelley continued to tell the Court that he could not remember what he said or Defendant's response; the Court would just have to accept his general feeling for what he typically says in similar situations. (*Id.* at 19).

7

On cross-examination, Agent Kelley reiterated that he could not recall what words he and the Defendant exchanged. (*Id.* at 27, 29). When asked by defense counsel whether the best memorialization of the dialogue that occurred would be in the report that Agent Kelley prepared on May 1, the witness agreed that it would. (*Id.* at 27). When Agent Kelley was asked to read the pertinent parts of his report while video of his encounter with Defendant was playing, to determine whether the timing aligned, he refused. (*Id.* at 27–29). Instead, the agent proffered only hypothetical versions of what he could have said to fit the timeframe of his interaction with Defendant. At this point, he admitted that the words used in his report were "law enforcement lingo" and might not reflect what was actually said to Defendant. (*Id.* at 29, 31–34).

The Court explained to Agent Kelley the importance of learning what he said to Defendant during their encounter, as well as the difficulties posed in determining what was said where "we have a report that you wrote where you say you said something and today you're telling us that, no, you didn't really say that because it's law enforcement lingo, but you don't remember what you said." (*Id.* 32–33). The Court then posed the linchpin question: "[W]hat is it that [Agent Kelley] told this Defendant that made [the agent] think the Defendant understood what he was asking and was agreeing to this request for consent, as you all have labeled it." Agent Kelley responded: "[The report] states that I got consent, which is what happened. I asked him for consent to be scanned and he gave me the consent by driving across the at least three or four lanes of -- over to the machine." (*Id.* at 33–

8

34).

## C. Testimony of Homeland Security Investigations Special Agent DiAndrea

The testimony of HSI Special Agent DiAndrea neither clarified nor corroborated Agent Kelley's version of events. Special Agent DiAndrea admitted to not having been present during Agent Kelley's interaction with Defendant, when consent to search the vehicle was supposedly requested and granted. (*Id.* at 47–50). In fact, the only information relayed by Special Agent DiAndrea relevant to the instant inquiry was a counter-narrative provided by Defendant. (*Id.* at 47, 49).

According to Special Agent DiAndrea, and substantiated by audio played for the Court, Defendant claimed that Agent Kelley only told him, "hey go, go to that line," which prompted Defendant to say "cool" and move to the lane he was directed toward. (*Id.* at 47–49). The Court was unable to assess Defendant's demeanor while making those statements or more thoroughly probe his version of events, but the statements seem to more plausibly align with the timeline of events that can be seen in the video of Defendant's encounter with Agent Kelley.

## D. Factual Findings

It is clear from the video and testimony that when Defendant arrived at the checkpoint's primary inspection, he was asked to move his vehicle to another lane. What is less clear is whether Agent Kelley explained to Defendant that he was being directed to another lane for an electronic search of his vehicle's interior.

On the witness stand, Agent Kelley could not recall what he said to Defendant. All the agent was prepared to offer was his general recollection that at

9

some point during their two-second encounter, he first ascertained U.S. citizenship, then in some manner requested and obtained permission to search Defendant's vehicle with the VACIS. The Court cannot assume the veracity of an agent's statements simply by virtue of his position in the law-enforcement community. Obtaining consent to conduct a search allows government agents to sidestep powerful constitutional protections. To convince the Court that such consent has been obtained, the Government should be prepared to offer more than vague generalizations about how that occurred or extrapolations from typical practice.

Perhaps just as important, the narrative that Defendant relayed to Special Agent DiAndrea more neatly aligns with the timing of events in the video. As was stated above, the vehicle comes to a stop at the nine-second mark, and Agent Kelley can be seen stepping forward to speak to the driver. Before the eleven-second mark, Agent Kelley's hand rises to begin gesturing Defendant toward something off-screen—sufficient time to make a citizenship inquiry and begin instructing Defendant to pull forward to another lane. Between the twelve- and fourteen-second marks, as Agent Kelley continues to gesture toward something out of view, he seems to be directing Defendant around cones and to the VACIS, just as he testified to having done. (Dkt. No. 39 at 11). What is not clear from the video, what the Government has not convinced the Court of, is that Defendant was ever told what would happen when he followed Agent Kelley's direction to move to another lane. Hypothetical could-haves or would-haves simply will not do.

In light of the foregoing, the Court concludes that the Government has not

proven by a preponderance of the evidence that Defendant consented to a law-enforcement search of his vehicle. In the absence of such a showing, it is unnecessary for the Court to delve into the voluntariness, scope, and authority prongs of the consent-to-search analysis.

IV. CONCLUSION

"I think it a less evil that some criminals should escape than that the government should play an ignoble part." *Olmstead v. United States*, 277 U.S. 438, 469 (1928) (Holmes, J., dissenting). In this case, the agent's intuition to investigate Defendant further proved prescient; execution on that impulse, however, was flawed. While searching a person's vehicle without first developing probable cause or obtaining consent may be permissible at this nation's ports of entry, the same is not true for individuals already within our borders. Moreover, working at one of the nation's busiest Border Patrol checkpoints does not excuse agents from knowing or following the law—travelers' constitutional protections are too important. While license-plate scans and dog-sniffs may be conducted at primary-inspection lanes, more invasive searches may not be conducted without agents first developing probable cause or obtaining consent.[8] If an agent's failure to know and follow the law is due to a lack of clear training, U.S. Customs and Border Protection should rectify that deficiency at once. Defendant's Motion to Suppress (Dkt. No. 28) is **GRANTED**.

---

[8] *See, e.g., United States v. Ortiz*, 422 U.S. 891, 896–97 (1975) ("[A]t traffic checkpoints removed from the border and its functional equivalents, officers may not search private vehicles without consent or probable cause.").

It is so **ORDERED**.

**SIGNED** July 11, 2018

_____
Marina Garcia Marmolejo
United States District Judge